**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMY RUDAWSKY, et al.,** | ) | |
| | ) | **Case No. C2 06 144** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Michael H. Watson** |
| **v.** | ) | |
| | ) | **Magistrate Judge Mark R. Abel** |
| **DOUGLAS G. BORROR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANT THE NEHEMIAH CORPORATION OF AMERICA'S
MEMORANDUM IN OPPOSITION TO CLASS ACTION CERTIFICATION**

Respectfully submitted,

/s/ Bruce L. Ingram
Bruce L. Ingram, Trial Attorney  (0018008)
Robert N. Webner   (0029984)
Philip F. Downey (0040308)
Thomas N. McCormick (0075496)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-6400

*Counsel for Defendant,
The Nehemiah Corporation of America*

## TABLE OF CONTENTS

**PAGE**

I.  PRELIMINARY STATEMENT ...................................................................................... 1

II.  BACKGROUND .......................................................................................................... 1

   A.  Plaintiffs' Claims ............................................................................................... 2
   B.  The Facts of Plaintiffs' Home Purchase Transactions ...................................... 4

      1.  The Rudawskys .......................................................................................... 4
      2.  The Beards .................................................................................................. 8

III.  ARGUMENT .............................................................................................................. 10

   A.  Plaintiffs' Proposed Class Does Not Satisfy The Commonality Requirement ..... 11
   B.  The Proposed Class Does Not Satisfy The Typicality Requirement ................... 12
   C.  Plaintiffs' Proposed Class Does Not Satisfy Rule 23(b)(3) ................................ 16
   D.  Plaintiffs' Proposed Class Does Not Satisfy Rule 23(b)(2) ................................ 21
   E.  No Class May Be Certified On The OCSPA Claim ............................................. 22

IV.  CONCLUSION ........................................................................................................... 23

## I.     PRELIMINARY STATEMENT

All of plaintiffs' claims in this case sound in fraud and require evidence of misstatements, materiality of the misstatements, justifiable reliance on those misstatements, and injury proximately caused by that reliance.  Plaintiffs' <u>own testimony</u> establishes that they did not have the same information when they bought houses from Dominion Homes, Inc. using down payment assistance gifts from the Nehemiah Program® and did not have similar understandings of, or reactions to, the information they did receive.  Their testimony confirms that the kind of information provided to or sought out by potential home buyers, and their individual reactions to such information, will vary in ways that make it impossible to resolve the essential elements of plaintiffs' claims on a class-wide basis.

If a class is certified, this Court would have to examine the circumstances of thousands of home purchase transactions to determine what oral and written information was provided to or obtained by the home buyers, whether they reasonably relied on the different mix of information they received, and whether that reliance in fact caused an injury.  For that central reason, among others, plaintiffs' class certification motion should be denied.

## II.     BACKGROUND

Courts must "conduct a 'rigorous analysis' into whether the prerequisites of Rule 23 are met before certifying a class."  <u>In re Am. Med. Sys.</u>, 75 F.3d 1069, 1078-79 (6th Cir. 1996) (citing <u>Gen. Tel. Co. of Sw. v. Falcon</u>, 457 U.S. 147, 161 (1982)).  As a result, ordinarily the class certification decision "should be predicated on more information than the pleadings will provide," and a trial court errs if it accepts conclusory allegations or presumes that Rule 23 requirements have been satisfied.  <u>Id.</u>  at 1079, 1081-82.

This Court first must consider whether the threshold requirements of Rule 23(a) have been met, and plaintiffs then "must show that the action is maintainable under Rule 23(b)(1), (2), or (3)."  Amchem Prods. v. Windsor, 521 U.S. 591, 614 (1997).  The "rigorous analysis" mandates that the Court carefully evaluate the Rule 23 criteria in light of the precise nature, and necessary elements, of plaintiffs' claims.  See Reeb v. Ohio Dept. of Rehab. and Corr., 435 F.3d 639, 644-45 (6th Cir. 2006); Stout v. J.D. Byrider, 228 F.3d 709, 716 (6th Cir. 2000); Sprague v. Gen. Motors Corp., 133 F.3d 388, 397 (6th Cir. 1998) (en banc); see also Allison v. Citgo Petroleum Corp., 151 F.3d 402, 419 (5th Cir. 1998) ("deciding whether common issues predominate and whether the class action is a superior method to resolve the controversy requires an understanding of the relevant claims, defenses, facts, and substantive law presented in the case".

### A.    Plaintiffs' Claims

Plaintiffs Scott and Amy Rudawsky and Jeff and Michelle Beard purchased their current homes from Dominion Homes, Inc. ("Dominion") using down payment assistance gifts of thousands of dollars provided by The Nehemiah Program®, which is operated by The Nehemiah Corporation of America ("Nehemiah").  Their Complaint alleges that plaintiffs were not aware that, after their purchases, the Program received replenishment payments from Dominion in amounts equal to the amount of their down payment assistance gift, as well as a processing fee. See Complaint ¶¶ 77, 84, 97, 98.  They claim that, as a result, the gifts were not gifts, and they further allege – incorrectly – that the amount of the gifts has been incorporated into the prices of their homes.  See Complaint ¶¶ 84, 98.  On the basis of these allegations, the Complaint asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Ohio Corrupt Activities Act, and the Ohio Consumer Sales Practices Act ("OCSPA"), as well as

common law claims for fraud and fraudulent inducement, deceit, and concealment.  Id. ¶¶ 125-54.[1]

Plaintiffs' civil RICO and Ohio Corrupt Activities Act claims are based on allegations that the defendants committed mail fraud and wire fraud which proximately caused financial injury to plaintiffs.  See Complaint ¶¶ 125-35.  Such claims require proof that defendants engaged in "misrepresentations or omissions which were 'reasonably calculated to deceive persons of ordinary prudence and comprehension,'" that plaintiffs in fact relied on such misrepresentations, and that they experienced injury that was proximately caused by their reliance.  Blount Fin. Servs. v. Walter E. Heller & Co., 819 F.2d 151, 152-53 (6th Cir. 1987) (quoting United States v. Van Dyke, 605 F.2d 220, 225 (6th Cir.), cert. denied, 444 U.S. 994 (1979)); see also Holmes v. Sec. Investor Prot. Corp., 503 U.S. 258, 268-70 (1992); U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc., 342 F.3d 634, 643 (6th Cir. 2003) (citation omitted); Lum v. Bank of Am., 361 F.3d 217, 227 (3d. Cir. 2004); U.S. Demolition and Contracting, Inc. v. O'Rourke Constr. Co., 94 Ohio App.3d 75, 83 (1994) (RICO case law governs over Ohio Corrupt Activities Act claims).

Plaintiffs' next two claims, for fraud and "fraudulent inducement," require that plaintiffs prove false representations, justifiable reliance upon such representations, and a resulting injury that was proximately caused by the reliance.  See Complaint  ¶¶ 136-48; see also Andersons, Inc. v. Consol, Inc.,  348 F.3d 496, 505-06 (6th Cir. 2003).  Finally, their OCSPA claim requires plaintiffs to show a material misrepresentation, deceptive act or omission upon which consumers are likely to rely to their detriment and which then impacted plaintiffs' decision to purchase their

---

[1] Nehemiah has moved for judgment on the pleadings on plaintiffs' civil RICO and Ohio Consumer Sales Practices Act claims.  See Motion of The Nehemiah Corporation for Judgment on the Pleadings on RICO and CSPA Claims (filed May 5, 2006).  That motion is fully briefed and ripe for decision by this Court.

homes.  See Complaint ¶¶ 149-54; Temple v. Fleetwood Enters., 133 F. App'x. 254, 265 (6th Cir.

2005); Richards v. Beechmont Volvo, 127 Ohio App. 3d 188, 191 (1998).

In short, all of plaintiffs' claims will require proof of (1) a material misrepresentation that

would deceive a person of ordinary intelligence, (2) actual and justifiable reliance on the claimed

misrepresentation, and (3) an injury in fact proximately caused by that reliance.

## B.    The Facts of Plaintiffs' Home Purchase Transactions[2]

### 1.    The Rudawskys

Mr. Rudawsky is a Senior Credit Analyst for BMW Financial Services who reviews

financial information for BMW dealers and performs commercial underwriting.  Dep. of Scott

Rudawsky, at 13-14, Exhibit 3.  Previously, he was a credit analyst for Huntington National

Bank.  Id. at 15-16.  Mrs. Rudawsky does not work outside of the home.  Dep. of Amy

Rudawsky, at 10, Exhibit 4.

The Rudawskys began looking for homes in late December, 2002.  S. Rudawsky Dep., at

27.  They gathered information from newspapers, internet searches, discussions with family

members, and meeting with their realtor, Debbie Saczawa.  Id. at 24-28; A. Rudawsky Dep., at

27-28.  In February 2003, the Rudawskys visited the Village of Polaris Park and met Rob Little

and Michael Metz, who were Dominion sales representatives.  A. Rudawsky Dep., at 42-44.  The

---

[2] Much of plaintiffs' brief is devoted to arguing that the defendants engaged in an improper scheme to "work around" regulatory requirements governing down payment assistance programs and that Nehemiah is not a true charity.  See Pls' Supplemental Motion for Class Certification, at 8-15.  Such arguments are neither appropriate nor relevant to class certification analysis, which does not review the "merits" of a dispute.  See Daffin v. Ford Motor Co., 458 F.3d 549, 553 (6th Cir. 2006) ("a court should not conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action" (quotation omitted)).  So that such arguments do not go without any response, Nehemiah simply notes that the Nehemiah Program® is in full compliance with all applicable rules and regulations and that it will offer proof of that fact at trial.  See Aff. of Walt McDaniel (March 15, 2007) ¶ 7, Exhibit 1.  Nehemiah also notes that it is a Section 501(c)(3) nonprofit corporation that, since 2000, has given millions of dollars to various non-profit funds and organizations.  Id. ¶ 2,8; Dep. of David Baritell, at 23-24, Exhibit 2.

In reality, plaintiffs' arguments and denigration of Nehemiah's charitable work is a transparent effort to distract the Court from what the discovery in this case, including plaintiffs' own testimony, has made clear – this case does not satisfy the requirements of Rule 23 and should not be certified as a class action for obvious reasons.

Rudawskys told Little that they had no money for a down payment,[3] and in response Little mentioned the Nehemiah Program® and stated that it was a non-profit corporation that made gifts to first- time home buyers to help them with down payments.  Id. at 47-50.

The Nehemiah Program® provides down payment assistance gifts to potential home buyers who otherwise qualify for a mortgage, but who lack available cash to make down payments and cover closing costs.  See Aff. of Walt McDaniel (March 15, 2007) ¶3, Exhibit 1. The Program is available for purchases of new homes, re-sale homes, condominiums, and some multi-family units.  Id. ¶ 4.  Since it began operating in 1998, it has helped more than 220,000 families buy homes and has provided more than $870 million in down payment gifts.  Id. ¶ 3; D. Baritell Dep., at 90-91.

Significantly, both Mr. and Mrs. Rudawsky admit that Little explicitly told them that Dominion and other builders made contributions to the Nehemiah Program®.  A. Rudawsky Dep., at 47-49; S. Rudawsky Dep., at 99-100.[4]  The Rudawskys never asked Little follow-up questions about the frequency or amount of Dominion's contributions.  S. Rudawsky Dep., at 267-268; A. Rudawsky Dep., at 49.

The Rudawskys further concede that their complete understanding about the Nehemiah Program® was based on their oral conversations with Little; they never spoke to anyone at Nehemiah or reviewed the Nehemiah website, which provides significant information about the Program, including information related to the sellers replenishment of the gift fund pool.  A.

---

[3] Mrs. Rudawsky concedes that the Rudawskys did not have available funds to cover the down payment on their home.  A. Rudawsky Dep., at 47.  Although they claim that their parents offered to provide some financial assistance, they acknowledge that the offers were not specific in terms of their amount or whether the assistance would be in the form of a loan or an outright gift. S. Rudawsky Dep., at 46.

[4] The Nehemiah Program® requires a home seller to qualify the home as a "participating home" by signing a Participating Home Agreement which confirms that, after the close of the transaction in which the buyer receives a down payment assistance gift, the seller will transfer funds to the Program in an amount equal to the size of the gift and will pay a service fee. McDaniel Aff. ¶ 5; D. Baritell Dep., at 55-56, 58, 88-90.  The payments by the sellers replenish the gift fund pool so that funds remain available to provide down payment assistance to future home buyers, and the service fees cover operating expenses and help to fund other charitable initiatives.  Id.

Rudawsky Dep., at 185-88; S. Rudawsky Dep., at 229-230.[5]  They did, however, discuss

Nehemiah and zero down payment programs with their realtor and Mrs. Rudawsky's father, Rob

Shelton.  S. Rudawsky Dep., at 267.

On March 10, 2003, the Rudawskys signed a Purchase Agreement in which they agreed

to pay $164,425 for their home.  Exhibit 6.  They admit that the base price of the home was set

before they ever visited the Village of Polaris Park and before they ever agreed to accept a down

payment assistance gift from the Nehemiah Program®.  S. Rudawsky Dep., at 119-121.  They

received no indication that a lower price would be charged if they did not accept a down

payment assistance gift.  A. Rudawsky Dep., at 130-131.  The Rudawskys elected a carpet

upgrade that added $525 to the cost of their home.  S. Rudawsky  Dep., at 125.  They admit that

the $164,425 purchase price was acceptable to them and their realtor.  Id. at 163.

The Rudawskys were first shown a Nehemiah Program® gift letter on March 19, 2003,

nine days after they signed the Purchase Agreement.  Exhibit 7; A. Rudawsky Dep., at 151.  The

letter states that the down payment assistance funds would be a gift and provides that the

Rudawskys understand that they "are under no obligation whatsoever to repay any amount of

down payment assistance received from" Nehemiah.  Exhibit 7.[6]  Mr. Rudawsky understood the

letter to say that they would not need to repay the gift; although he now contends that he did not

understand specific sections of the letter, he did not ask any questions about the letter or the

---

[5] Since 1998, Nehemiah has provided a publicly accessible website, www.getdownpayment.com, that provides a great deal of information about the Nehemiah Program®, and many homebuyers have visited the website to research the Program.  McDaniel Aff. ¶ 9.  Nehemiah's website states that home sellers make contributions and pay processing fees to Nehemiah and fully explains the replenishment process.  See Exhibit 5, Affidavit of Philip F. Downey and Exhibit A to Mr. Downey's Affidavit.  Potential homebuyers also may call Nehemiah's toll-free customer service center to obtain information about how the Nehemiah Program® works and help with the down payment assistance gift and home purchase process.  Id.  In addition, Nehemiah offers a free homebuyers education program.  Id.

[6] The Program requires that the prospective home buyer qualify for, and use, a loan product which allows the buyer to accept a down payment assistance gift from a non-profit charitable organization.  McDaniel Aff. ¶ 6.  Appropriate products include FHA-insured loans and some conventional loans.  Id.  The buyer must sign a gift letter that confirms that the buyer is purchasing a "participating home" and is accepting a down payment assistance gift from the Program and has no obligation to repay the gift.  Id.; D. Baritell Dep., at 55-56, 73-74, 108.

sections that he did not understand.  S. Rudawsky Dep., at 255-57.  Mrs. Rudawsky does not recall any specific discussion regarding the letter.  A. Rudawsky Dep., at 151-152.

The Rudawskys closed on their home four months later, July 8, 2003.  Exhibit 8.  At that time, they signed a second down payment assistance gift letter, which similarly states that the funds were a gift that the Rudawskys were under no obligation to repay.  Exhibit 9.  Mrs. Rudawsky does not recall if she read the letter or understood what it said; A. Rudawsky Dep., at 195-196; Mr. Rudawsky states that he did not understand portions of the letter, but he again did not ask any questions about it.  S. Rudawsky Dep., at 257-258.

Importantly, at their closing the Rudawskys were provided with a "HUD-1" statement, which provides disclosures about charges imposed upon the borrower and charges imposed upon the seller in real estate transactions.  Exhibit 8.[7]  The HUD-1 explicitly discloses that the Rudawskys purchased their home for precisely the same price agreed upon in the Purchase Agreement, that the Rudawskys had received a down payment assistance gift from the Nehemiah Program®, and that Dominion was making a replenishment payment in the amount of the gift, plus a processing fee, to the Program.  Id. at lines 101, 215, 515, 1305.  The Rudawskys signed documents attesting that they received the HUD-1 disclosure at their closing.  Id. at Addendum. They now contend that they did not understand, or "don't grasp," the HUD-1 disclosures.  See S. Rudawsky Dep., at 250-252; A. Rudawsky Dep., at 94.[8]

---

[7] The Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq*., mandates that disbursements made in conjunction with residential real estate transactions be disclosed on a uniform settlement statement and requires that a standard form be developed to show all settlement costs to be used in all real estate settlement transactions involving federally related mortgages.  See id. § 2603.  This settlement statement, identified in 24 C.F.R. § 3500.2 as a "HUD-1," "shall conspicuously and clearly itemize all charges imposed upon the borrower and all charges imposed upon the seller in connection with the settlement" and "shall be completed and made available for inspection by the borrower at or before settlement."  See 12 U.S.C. § 2603(a), (b).

[8] In early 2006, Mrs. Rudawsky and her father reviewed the HUD-1 the Rudawskys had been provided at the closing and determined that a "scam" had occurred because the Nehemiah Program® gift of $4,932.75 appeared both as a credit to the buyer and a deduction to the seller.  A. Rudawsky Dep., at 83-84, 88.  At their depositions, however, the Rudawskys declined to answer questions about why they believe they were part of a "scam," citing the attorney-client privilege.  S. Rudawsky Dep., at 137-139, 258-259; A. Rudawsky Dep., at 92-94.

2.    **The Beards**

Mr. Beard has an accounting degree from Tiffin University and a Masters of Business Administration degree from Capital University.  Dep. of Jeff Beard, at 28-29, Exhibit 10.  He is a Certified Public Accountant who performed external audits for the Crowe Chizek accounting firm for five years, served as the Chief Financial Officer for Ohio-Emerald Bank, and works at Wendy's International, where he prepares filings with the Securities and Exchange Commission. Id. at 24, 27-28.  Mrs. Beard received her accounting degree from Notre Dame and is a CPA who performs audit work for the Crowe Chizek firm.  Dep. of Michelle Beard, at 10-11, 13, Exhibit 11.

The Beards first considered buying a home in late 2002.  J. Beard Dep., at 35; M. Beard Dep., at 20- 21.  On January 5, 2003 they visited the Village of Polaris Park for the first time, and signed a Purchase Agreement to buy a Dominion home that same day.  J. Beard Dep., at 45-46; Exhibit 12.  They dealt with Dominion salesman Michael Metz, who told them that Nehemiah was a non-profit association that made gifts to home buyers that the buyers did not have to repay.  M. Beard Dep., at 53-54; J. Beard Dep., at 90-92.  The Beards did not have funds available to make a down payment.  J. Beard Dep., at 117; M. Beard Dep., at 68.[9]

According to the Beards, Metz did not tell them that home sellers like Dominion make replenishment payments to the Nehemiah Program®.  Indeed, Mr. Beard testified that had he known that Dominion and other sellers made such payments, he would have been concerned and may not have signed the Purchase Agreement.  J. Beard Dep., at 193.  Nevertheless, the Beards never asked Metz any questions about Nehemiah.  M. Beard Dep., at 54-55; J. Beard Dep., at 158.

_____

[9] Mrs. Beard's father offered to provide financial assistance to the Beards, but neither the total amount of the assistance he might provide, nor whether the assistance would be in the form of a loan or a gift, were addressed. J. Beard Dep., at 128-30; M. Beard Dep., at 72-73.

The Purchase Agreement stated that the Beards agreed to pay a base price of $162,900 and had selected an upgraded refrigerator for $600, making the total purchase price $163,500. Exhibit 11.  Mrs. Beard's father, who runs a construction company in Bucyrus, Ohio, told them $100 per square foot, which is what they were paying, was a reasonable price for a home.  J. Beard Dep., at 159-160; M. Beard Dep., at 79-81.  They do not recall whether they agreed upon the purchase price before or after communicating their desire to use the Nehemiah Program®, and they admit that they received no indication that the price would be lower if they did not use the Program.  M. Beard Dep., at 65-68; J. Beard Dep., at 104-106.

The Beards were first presented with a Nehemiah gift letter on January 22, 17 days <u>after</u> they signed the Purchase Agreement.  Exhibit 13; J. Beard Dep., at 167.  The letter stated that the funds would be a gift that the Beards had no obligation to repay.  Exhibit 13.  Mr. Beard does not recall whether he read or signed the letter on January 22 and does not recall asking any questions or discussing the gift letter with Metz or anyone else from Dominion.  J. Beard Dep., at 170-72.

Prior to the closing, the Beards' entire understanding of the Nehemiah Program® was based on their conversations with Metz.  <u>Id</u>. at 140-142.  Before the closing, they never asked anyone any questions about the Program, never visited the Nehemiah website, and never spoke directly to anyone from Nehemiah.  J. Beard Dep., at 139-142; M. Beard Dep., at 153-154.

The Beards signed a second Nehemiah gift letter at their closing on June 19, 2003, but neither Mr. Beard nor Mrs. Beard recalls reading the letter before signing it.  J. Beard Dep., at 172-174; M. Beard Dep., at 150-151.  At that time, the closing agent told the Beards that that they did not need to repay the Nehemiah gift funds.  J. Beard Dep., at 142-145.  At their closing, the Beards were given a HUD-1 statement, which showed that they were paying the same price stated in the Purchase Agreement, stated that they were receiving a gift of $4,905.00 from

Nehemiah, and showed that Dominion would make replenishment payments of $4,905.00, plus a processing fee payment of $385.00, to the Nehemiah Program®.  Exhibit 14, lines 101, 215, 515, 1305.  The Beards signed documents certifying that they received the HUD-1 at their closing. Id. at Addendum.

During the closing the Beards and the title agent discussed "in general" Dominion's replenishment payment to the Nehemiah Program®.  J. Beard Dep., at 154.  Neither of the Beards asked any questions about the references to the Program on the HUD-1.  J. Beard Dep., at 154-155; M. Beard Dep., at 97-98, 109-110.  They candidly admit that their review of the HUD-1 statement was focused on the portion summarizing their transactions, not the portion reflecting Dominion's disbursements.  J. Beard Dep., at 157; M. Beard Dep., at 97-99.[10]

## III.    ARGUMENT

This Court should deny the class certification motion because this case does not satisfy the requirements of Rule 23.  In contradiction of the allegations in their Complaint, plaintiffs have admitted that they received accurate information about the Nehemiah Program® and the replenishment payments, and fee payments, by Dominion.  That testimony is fatal to their motion because it confirms that the central issues raised by plaintiffs' pleaded claims – did putative class members receive misleading statements calculated to deceive, did they reasonably rely on such statements, and did they suffer damages as a result – cannot be decided on a classwide basis.

As the plaintiffs' testimony reveals, the kind of information that putative class members received about their transactions clearly will differ.  To the extent any homeowners claim to have been affirmatively told that Dominion would not replenish the Nehemiah Program® gift fund, such claims would be materially different from those of the named plaintiffs.  Some persons, like

---

[10] Like the Rudawskys, the Beards now believe the purchase price of their home was increased because they participated in the Nehemiah Program®, but they refuse to state the basis for their opinion.  J. Beard Dep., at 160-164; M. Beard Dep., at 123-124.

the Rudawskys, will have received oral disclosures about the Program – oral statements that may vary – while others like the Beards will not.  Some persons will have sought more information about the Program by questioning their realtor, downloading information from the Nehemiah website, calling the Nehemiah helpline, or some other means.  <u>See</u> McDaniel Aff. ¶ 9.  The total mix of information available to class members therefore will be highly individualized.

Equally important, the <u>reaction</u> of such persons to the information they have received – and whether they in fact reasonably relied on that information – also will be personal in nature.  Some persons will have read the written disclosures in the HUD-1 statements and understood that Dominion would make payments to replenish the Nehemiah Program® fund; such persons cannot allege that they were deceived about that fact and thus cannot pursue the claims asserted in this case.  Persons who claim they did <u>not</u> understand the HUD-1 disclosures undoubtedly will identify different reasons for that fact – whether it be that they did not read the disclosures, or that their personal circumstances rendered them incapable of understanding the disclosures, or that they were affirmatively misled about the disclosures by their realtors or others.  In any case, the issue of how putative class members <u>understood</u> and <u>reacted to</u> the information they received also will pose individual questions of law and fact that cannot be resolved on a classwide basis.

### A.     <u>Plaintiffs' Proposed Class Does Not Satisfy The Commonality Requirement</u>

Rule 23(a)(2) requires a showing of "questions of law or fact common to the class."  As the Sixth Circuit has explained:  "It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality.  What we are looking for is a common issue the resolution of which will advance the litigation."  <u>Sprague</u>, 133 F.3d at 397; <u>see also</u> <u>Lichoff v. CSX Transp., Inc.</u>, 218 F.R.D. 564, 571 (N.D. Ohio 2003).

Here, each putative class member will have received, at different times, a different mix of information about the Nehemiah Program® and the replenishment payments made by Dominion, and each will have responded differently to such information. To determine whether a putative class member can satisfy the essential elements of plaintiffs' claims – misstatements of fact, justifiable reliance on such misstatements, and actual damage proximately caused by such reliance – this Court will need to address the circumstances and subjective understandings of each putative class member.

For these reasons, this case is analogous to Sprague, 133 F.3d at 398, where the plaintiffs sought to certify a class of persons asserting estoppel claims. The Sixth Circuit reasoned that because each putative class member received different, non-uniform information, and then had to prove justifiable reliance on that information, estoppel claims would involve individualized proof and thus were inappropriate for class treatment. Id. The Court explained that the "myriad variations" demonstrated that the "commonality" requirement was not satisfied. Id.; see also In re Jackson Nat'l Life Ins. Co. Premium Litig., 209 F.R.D. 134, 141 (W.D. Mich. 2002). Here, too, the "myriad variations" in the information available to putative class members and their understanding of, and response to, such information demonstrate that commonality is lacking and no class should be certified.

**B.** **The Proposed Class Does Not Satisfy The Typicality Requirement**

Rule 23(a)(3) provides that the "claims . . . of the representative parties" must be "typical of the claims . . . of the class." The typicality requirement limits the class claims to the claims of the class representatives, so that "in pursuing his own claims, the named plaintiff will also advance the interests of the class members." In re Am. Med. Sys., 75 F.3d at 1082 (citation omitted); see also Stout, 228 F.3d at 717; Sprague, 133 F.3d at 399.

12

Plaintiffs give only cursory attention to typicality, and attempt to gloss over the material distinctions between the claims of the named plaintiffs and those of absent class members by citing testimony from a Dominion executive that the named plaintiffs' transactions were "standard."  Pls' Supp. Motion, at 27-28.  That statement, of course, does not make plaintiffs' claims of <u>fraud</u> in connection with those transactions "typical"; if that were true, any case in which putative class members engaged in a similar transaction would be suited for class action treatment.  Of course, that is not the law, because the nature of fraud claims largely focuses on matters separate from the form of the underlying transaction.  As noted above, fraud-related claims look to the information available to the individual who claims to have been defrauded, whether that information was accurate or misleading, whether the individual reasonably relied on such information, and whether the individual experienced damage as a result.  Plaintiffs' own testimony demonstrates that these kinds of <u>relevant</u> circumstances were <u>not</u> "standard."

The same considerations that demonstrate lack of commonality also demonstrate lack of typicality.  Each class member would be required to show misrepresentations that allegedly were operative at the time of his purchase and his own reliance on such misrepresentations – a circumstance which demonstrates lack of typicality.  <u>See</u> <u>Sprague</u>,133 F.3d at 399; <u>In re Jackson Nat'l Life Ins. Co. Premium Litig.</u>, 209 F.R.D. at 141-42.  In <u>Sprague</u>, the Court held that a group of early retirees did not meet the typicality requirement and stated:

> In pursuing their own claims, the named plaintiffs could not advance the interests of the entire early retiree class.  Each claim, after all, depended on each individual's particular interactions with [defendant]-and these, as we have said, varied from person to person.  A named plaintiff who proved his own claim would not necessarily have proved anybody else's claim.

133 F.3d at 399.  The Court further stated that the typicality requirement is "not satisfied where different groups of class members received different representations." <u>Id</u>. (citing <u>Retired Chicago</u>

13

Police Ass'n v. City of Chicago, 7 F.3d 584, 597 (7th Cir.1993)). See also Pettrey v. Enter. Title Agency, Inc., No. 1:05-CV-1504, 2006 WL 3757310, *11 (N.D. Ohio Dec. 19, 2006) (plaintiff failed to show commonality and typicality in connection with negligent misrepresentations claim because reliance could not be demonstrated on a class-wide basis).

Similarly, in Stout, the Sixth Circuit denied class certification on fraud, Truth-In-Lending, and OCSPA claims.  There, the proposed class included all persons who had purchased and financed an automobile from defendants since 1993.  228 F.3d at 717.  Typicality was lacking because "[p]laintiffs' claims rest on their understanding of the purchasing transaction and each buyer's understanding of the terms."  Id.  The Court noted  discrepancies in the cars purchased, the purpose for the purchase, the extent of injury, and the "individual circumstances and transactions surrounding each purchase including each class member's understanding of the terms and conditions of their purchase agreements."  Id.

In this case, too, typicality is absent because "different groups of class members received different representations."  Sprague, 133 F.3d at 399.  The Rudawskys state that Little told them that the Nehemiah Program® was funded with contributions from Dominion and home builders, whereas the Beards have not testified that they received a similar disclosure.  Compare A. Rudawsky Dep., at 47-49; S. Rudawsky Dep., at 99-100 with J. Beard Dep., at 193.  Moreover, the Beards clearly believe such information was material; Mr. Beard testified that if he had known that information, he probably would not have signed the Purchase Agreement for his home.  J. Beard Dep., at 193.

These kinds of significant variations in the kind of information provided to potential home buyers, and the potential home buyers' reactions and responses to such varying information, will be found in each of the thousands of transactions plaintiffs want to sweep into

this case. The proposed class would include hundreds of individuals who bought their homes after discussions with different Dominion sales people, who had different levels of sophistication and knowledge of the process, and who had different exposure to different information about the Nehemiah Program® from their visits to websites, their calls to Nehemiah, their independent research, and their communications with realtors, family members, and friends.

For several reasons, the existence of the Nehemiah gift letters cannot, and do not, solve this fundamental flaw in plaintiffs' class certification arguments. First, plaintiffs admit that they did not receive the gift letter until weeks <u>after</u> agreeing to the purchase price by signing the Purchase Agreement; they therefore cannot claim to have relied on the gift letter in deciding to make their purchases and cannot claim that the letters proximately caused their claimed injuries. Second, the plaintiffs have testified that they either did not read, or did not understand, the gift letter, <u>see</u> A. Rudawsky Dep., at 151-152, 195-196; S. Rudawsky Dep., at 255-258; J. Beard Dep., at 170-174; M. Beard Dep., at 150-151, and they therefore cannot claim that they relied on letters that were unread or not comprehended. In any case, plaintiffs have no basis for arguing that their failure to read and understand the gift letters would be "typical" of the reactions of putative class members.

Nor can plaintiffs' claim that their reaction and responses to the written disclosures in the HUD-1 statements are "typical." Mr. Rudawsky admitted that he did not understand at least some of the disclosures, Mrs. Rudawsky stated that she doesn't "grasp the mathematical and financing things," and Mrs. Beard testified that she doesn't "necessarily understand" "how or why the entire thing works." S. Rudawsky Dep., at 250-252; A. Rudawsky Dep., at 94; M. Beard Dep., at 109-110. Mr. Beard, on the other hand, recalls seeing the HUD-1's disclosures on Dominion's replenishment payments and discussing it with the title agent. J. Beard Dep., at 154.

There is simply no basis for contending that these differing reactions, and understandings, would be "typical" of those of other home buyers. Furthermore, those differences obviously will be material to resolution of the reliance, causation, and damages elements of plaintiffs' claims.[11]

### C. Plaintiffs' Proposed Class Does Not Satisfy Rule 23(b)(3)

Plaintiffs argue that this case may properly be certified under Rule 23(b)(3). See Pls' Supp. Motion, at 31-35. As the Supreme Court and the Sixth Circuit have recently emphasized, the Rule 23(b)(3) requirements of predominance and superiority must be strictly applied. See Amchem Prods., 521 U.S. at 617; In re Am. Med. Sys., 75 F.3d at 1085.

This case presents claims by different individuals who bought their homes in different transactions, on the basis of a different mix of information, and with different understandings of that information. Each plaintiff must prove that he received a misrepresentation and that his individual reliance on that misrepresentation proximately caused his loss in order to recover on the claims plaintiffs have alleged. The individualized questions that flow from that central reality preclude a finding of predominance.

The Advisory Committee Notes to the Federal Rules state: "although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed." See Fed.R.Civ.P. 23(b)(3), Advisory Committee's Note (1966

---

[11] It also should be noted that the statutes of limitations applicable to plaintiffs' claims will affect different putative class members differently. The proposed class extends to purchases dating back to February 23, 1999 – seven years before plaintiffs filed their Complaint. Their RICO claim is subject to a four-year limitation period, see Agency Holding Corp., v. Malley-Duff & Assocs., Inc., 483 U.S. 143, 156 (1987), their Ohio Corrupt Practices Act claim is subject to a five-year limitations period, see Ohio Rev. Code § 2923.34(K), their fraud and fraudulent inducement claims are governed by four-year statute of limitations, id. § 2305.09(C), and OCSPA claims for damages are subject to a two-year statute of limitations, id. § 1345.10(C). Even if the discovery rule is applied, each home buyer should have discovered the truth about Dominion's replenishment payments when those payments were disclosed on the HUD-1 forms, which means that the claims of many class members would be time-barred. See Jones v. Aames Funding Corp., Civil Action No. 04-CV-4799, 2006 WL 2845689, *11 (E.D.Pa. Mar. 8, 2006) (holding that statue of limitations began to run on the date of the closing "[b]ecause plaintiffs, even as elderly, low-income borrowers, had a duty to read their mortgage contract and the documents they signed at closing, including the loan application, the HUD-1 form, and the TILA Disclosure Statement" (citation omitted)).

amendment) (citations omitted).  It therefore is not surprising that federal courts consistently deny class certification in cases involving fraud-based claims.

The first bar to predominance is the need to determine, on an individual basis, the information available to each class member.  For example, in Stout, the Sixth Circuit affirmed the district court's conclusion that plaintiffs in a case alleging fraud and violation of the Truth-in-Lending Act did not satisfy Rule 23(b)(3), and explained:

> In this case, the district court determined that the factual core of the case was whether each putative class member relied upon false representations or failures to disclose, and if so, what damages were proximately caused by that reliance. We find that this determination did not constitute an abuse of discretion by the district court in light of the fact that any resolution of the fraud or the TILA claims requires an individual assessment of what documents the customer reviewed and in what manner, what representations Defendants made to each customer, and whether the customer selected the extended service agreement.  See Castano v. American Tobacco Co., 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue.").

228 F.3d at 718.  See also Honorable v. The Easy Real Estate Sys., Inc., 182 F.R.D. 553, 561 (N.D. Ill. 1998) (denying Rule 23(b)(3) certification of class of homebuyers alleging fraud because "[o]ther than the advertisements that [defendants] placed in newspapers, the majority of the plaintiffs' claims of fraud and misrepresentation are based on oral misstatements made by the defendants.  To determine whether the oral statements are false, the court would have to examine every conversation that occurred.").

To similar effect, in Moore v. PaineWebber, Inc., 306 F.3d 1247 (2nd Cir. 2002), clients sued PaineWebber alleging fraud and RICO violations resulting from deceptive techniques used in marketing a life insurance policy as an IRA.  The Court stated:

> Liability for fraudulent misrepresentations cannot be established simply by proof of a central, coordinated scheme.  Rather, to recover for a defendant's fraudulent conduct, even if that fraud is the result of a common course of conduct, each plaintiff must prove that he or she personally received a material misrepresentation, and that his or her reliance on this misrepresentation was the proximate cause of his or her loss.

Id. at 1253. Likewise, the Court in Lichoff denied class certification in a fraud case brought by conductors who attended a CSX railroad training program. See 218 F.R.D. at 571-72. Judge Carr noted inconsistencies and discrepancies in the representations made to individual plaintiffs and found that "certification is inappropriate under Rule 23(b)(3)." Id. at 574.

In addition, as Courts repeatedly have found, the requirement of reliance is an individualized question of fact that overwhelms any common questions. See Sprague, 133 F.3d at 398. See Basic Inc. v. Levinson, 485 U.S. 224, 242 (1988) ("Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones."); Sandwich Chef of Texas, Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205, 219 (5th Cir. 2003) ("Claims for money damages in which individual reliance is an element are poor candidates for class treatment, at best…. This is because cases that involve individual reliance fail the predominance test…. The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification.") (quotations and citations omitted).[12]

Individualized causation issues also preclude Rule 23(b)(3) certification in this case. The decision in Poulos v. Ceasars World, Inc., 379 F.3d 654, 658 (9th Cir. 2004), is instructive. In that case, plaintiffs who played video poker machines alleged RICO and fraud claims against sixty gaming machine manufacturers and the casino and cruise ship operators that used the

_____

[12] See also Sikes v. Teleline, Inc., 281 F.3d 1350, 1363-64 (11th Cir. 2002); Johnston v. HBO Film Mgmt., 265 F.3d 178, 189-90 (3d Cir. 2002); In re LifeUSA Holding, Inc., 242 F.3d 136, 147-48 (3d Cir. 2001); Perrone v. Gen. Motors Acceptance Corp., 232 F.3d 433, 440 (5th Cir. 2000); Binder v. Gillespie, 184 F.3d 1059, 1062, 1064 (9th Cir. 1999); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 341 (4th Cir. 1998); Marcial v. Coronet Ins. Co., 880 F.2d 954, 957-58 (7th Cir. 1989); Krogman v. Sterrit, 202 F.R.D. 467, 479 (N.D. Tex. 2001); Krieger v. Gast, 197 F.R.D. 310, 320 (W.D. Mich. 2000); Yadlosky v. Grant Thornton L.L.P., 197 F.R.D. 292, 298-99 (E.D. Mich. 2000); Griffin v. GK Intelligent Sys., Inc., 196 F.R.D. 298, 305 (S.D. Tex. 2000); Ganesh, LLC v. Computer Learning Centers, Inc., 183 F.R.D. 487, 491 (E.D. Va. 1998); O'Neil v. Appel, 165 F.R.D. 479, 505-07 (W.D. Mich. 1996); Bear v. Oglebay, 142 F.R.D. 129, 132 (N.D. W. Va. 1992).

18

machines.  Plaintiffs argued that common issues of causation and reliance should be presumed because defendants made the same alleged misrepresentations by designing their machines and advertising to the public that the games involved random shuffling of a standard deck of cards followed by a deal and draw from such a deck.  Id. at 665.  The Court rejected plaintiffs' argument because "individual reliance issues relat[ing] to plaintiffs' knowledge, motivations, and expectations bear heavily on the causation analysis."  Id.

Significantly, courts have addressed these issues in cases involving home purchases.  For example, a Court recently denied class certification of RICO and state unfair trade practices claims that arose in connection with the purchase and financing of newly constructed homes. See Lester v. Percudani, 217 F.R.D. 345, 352 (M.D. Pa. 2003).  There, plaintiffs had purchased newly constructed homes through the "Why-Rent" program, alleged that they were subject to uniform misrepresentations through advertisements on television and radio.  Id. at 346-47.  The Court noted that plaintiffs would be required to prove that the allegedly fraudulent conduct actually caused plaintiffs to purchase at an inflated price, and reasoned:

> Even assuming individual reliance need not be proven, causation will depend significantly on the individual circumstances of the buyers and their reaction to the allegedly deceptive conduct of the defendants…. Although the fraudulent acts themselves may be common to the proposed class, issues of causation and proof of damages mandate the conclusion that individuals issues will predominate.

Id. at 352-53 (emphasis added).

Also pertinent is Briggs v. Countrywide Funding Corp., 183 F.R.D. 576, 582 (N.D. Ala. 1997).  In that case, the Court refused to certify a class of mortgagees in a fraud action against their mortgage company.  The plaintiff alleged that charges imposed by defendant were not legitimate and necessary, that some charges were for services never provided or only nominally

19

provided, and that uniform representations as to the charges were made through the HUD-1

statement.  Id. at 578, 582.  In denying certification, the Court reasoned:

> [T]o resolve the reliance question in this action, the court would need to examine
> each class member's background and experience in purchasing and financing a
> home. There is no doubt that the class members' education levels and practical
> experiences would differ widely. These widely variant levels of knowledge and
> experience greatly affect the reliance determination and make individual issues
> predominate.

Id. at 582 (emphasis added).  The Court added:

> Before the court could determine the issue of justifiable reliance in this instance,
> the court would need to examine each plaintiff's understanding about the
> documents and determine whether each plaintiff understood the broker to
> represent that the charges were actual and necessary by the simple use of the
> document.  It stretches the bounds of reason to believe that in every loan
> transaction no verbal explanations of the fees were given by any agents of
> Madison Equity.  Thus, the court would need to look at the circumstances
> surrounding each loan transaction to see what questions, if any, the individual
> plaintiffs asked concerning the charges and the responses given by the individual
> brokers or other agents of Madison Equity.

Id. at 582 (emphasis added).

In short, because the kind of information of information each putative class member

received, and then understood, will differ, crucial questions of whether misstatements occurred,

whether home buyers relied on those statements, and whether damages were caused as a result

must be resolved on an individualized basis.  Those individualized questions – which address the

essential elements of plaintiffs' claims – clearly predominate over the vague common questions

identified by plaintiffs.  See Pls' Supp. Motion, at 32-33.  Accordingly, litigation of this case on

a class basis would involve a welter of non-common, material issues, and unified proceedings

would quickly degenerate into a balkanized series of individualized determinations.  For that

reason as well, predominance is lacking in this case.  See Yadlosky v. Grant Thornton L.L.P.,

197 F.R.D. 292, 297 (E.D. Mich. 2000) ("Where numerous mini-trials are necessary to resolve

individual questions of reliance and causation, the benefits of a class action disappear"); O'Neil

v. Appel, 165 F.R.D. 497, 498 (W.D. Mich. 1996) ("district courts have refused to certify class

actions for the very reason that individual proof of reliance would be necessary, thus creating an

unmanageable lawsuit in which numerous 'mini-trials' on the issue of reliance and damages

would overwhelm common issues" (citation omitted)).

Finally, Rule 23(b)(3) requires that a party seeking certification show that a class action

is superior to other available methods for the fair and efficient adjudication of the controversy.

In this case, the overwhelming, individualized issues noted above also establish that class

treatment is not superior.  See In re Am. Med. Sys., 75 F.3d at 1085; Allison, 151 F.3d at 419.

One of the criteria to be used in determining whether a class action is a superior method

of adjudication is the interests of the class members in individually controlling their own claims.

See Fed.R.Civ.P. 26(b)(3).  That factor is particularly important in this case, where plaintiffs

seek to assert fraud claims in connection with the home purchases of thousands of absent class

members.  Home owners clearly have an interest in determining, themselves, whether they

believe they have been defrauded in their home purchase, whether they believe that a generous

down payment assistance gift that enabled them to purchase their home in fact caused them

injury, whether they should sue the charitable organization that allowed them to enjoy the

benefits of home ownership, and whether they have any interest at all in seeking rescission of

their home purchase.

### D.    Plaintiffs' Proposed Class Does Not Satisfy Rule 23(b)(2)

Plaintiffs next argue that their Ohio Corrupt Activities Act and OCSPA claims should be

certified under Rule 23(b)(2).  See Pls' Supp. Motion, at 35-37.  Certification under Rule

23(b)(2) is only proper when the defendants "acted or refused to act on grounds generally

applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

Significantly, certification under Rule 23(b)(2) is <u>not</u> appropriate where plaintiffs seek money damages that are not "incidental" to the requested injunctive or declaratory relief. <u>Coleman v. Gen. Motors Acceptance Corp.</u>, 296 F.3d 443, 447 (6th Cir. 2002); <u>see also</u> <u>Reeb v. Ohio Dep't of Rehab. and Corr.</u>, 435 F.3d 639, 651 (6th Cir. 2006).  In this case, plaintiffs' Corrupt Activities Act claim seeks "three times the total of their financial injuries, as well as their litigation costs and a reasonable attorney fee" and their OCSPA claim seeks compensation for "financial loss and other injuries in addition to their litigation costs and a reasonable attorney fee."  Complaint ¶¶ 135, 153.  These extensive – indeed, trebled – damages sought by plaintiffs are not "incidental" to the request for injunctive relief.  <u>See</u> <u>Reeb</u>, 435 F.3d at 650-51; <u>Coleman</u>, 296 F.3d at 449.  Instead, the money damages predominate over any claim for injunctive relief to the extent that plaintiffs do not seek any specific injunction and they have not identified any continuing conduct, applicable to the proposed class, that should be enjoined. Therefore, this case should not be certified under Rule 23(b)(2).

### E.     <u>No Class May Be Certified On The OCSPA Claim</u>

To maintain a class action under the OCSPA, plaintiffs must meet all the requirements set forth in Rule 23 and must show that defendants had prior notice that their conduct was deceptive.  Ohio Rev. Code § 1345.09(B).  The "prior notice" must have been provided by a rule adopted by the Ohio Attorney General under Ohio Rev. Code § 1345.05(B)(2) or a court decision made available for public inspection by the Attorney General under Ohio Rev. Code § 1345.05(A)(3).  <u>See</u> <u>Marrone v. Philip Morris USA, Inc.</u>, 110 Ohio St. 3d 5, 10 (2006).

As the Ohio Supreme Court recently explained, proper notice under the OCSPA exists only if there is a "substantial similarity between a defendant's alleged violation of the Act and an act or practice previously declared deceptive," with the practice at issue, and the practices addressed in the "notice" documents, being similar "in essential circumstances or conditions." See Marrone, 110 Ohio St. 3d at 10 (citation omitted).  In this case, none of the cases or rules cited by plaintiffs, see Pls' Supp. Motion, at 38-40, are similar "in essential circumstances or conditions" to the Nehemiah Program®.  See Id.; see also Faralli v. Hair Today, Gone Tomorrow, No. 1:06 CV 504, 2007 WL 120664, *13-14 (N.D. Ohio Jan. 10, 2007) (following Marrone and refusing to certify OCSPA claim because "substantial similarity" lacking).  The Program, unlike the "notice" documents cited by plaintiffs, does not require a home buyer to repay the gift or pay any charges, ample information about the Program is provided on the Nehemiah website, and Dominion's replenishment payment to the Program is disclosed, in writing, on the HUD-1 statements provided to plaintiffs.

## IV.    CONCLUSION

Plaintiffs' own testimony, examined in light of the essential elements of their pleaded claims, establishes that this case cannot proceed as a class action.  Plaintiffs admit that they each received different mixes of oral and written information about their purchase of Dominion homes using down payment assistance gifts from the Nehemiah Program® and reacted differently to the information they received.  Accordingly, core elements of plaintiffs' claims, such as the existence of factual misstatements or omissions, justifiable reliance, proximate causation, and injury in fact cannot be resolved on a class basis.  For those reasons, and other reasons stated herein, this Court should deny plaintiffs' motion for class certification.

Respectfully submitted,

23

/s/ Bruce L. Ingram
Bruce L. Ingram, Trial Attorney  (0018008)
Robert N. Webner   (0029984)
Philip F. Downey (0040308)
Thomas N. McCormick (0075496)
Vorys, Sater, Seymour and Pease LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-6400

*Counsel for Defendant,*
*The Nehemiah Corporation of America*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 15th day of March, 2007, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Gary Michael Smith, Esq. (0017141) | James E. Arnold, Esq. (0037712) |
| Amy Gullifer, Esq. | James G. Vargo, Esq. |
| Steven Robert McCann, Esq. | Clark Perdue Arnold & Scott Co., LPA |
| Graham & Graham Co., L.P.A. | 471 East Broad Street, Suite 1400, |
| Graham Law Building | Columbus, Ohio 43215-3853 |
| 17 North Fourth Street | Telephone: (614) 469-1400 |
| P.O. Box 340 | |
| Zanesville, Ohio 43702-0340 | *Counsel for Defendants Douglas G. Borror,* |
| Telephone: (740) 454-8585 | *Davis S. Borror, Robert A. Meyer, Jr., Terry* |
| | *E. George, Peter J. O'Hanlon, BRC* |
| *Counsel for Plaintiffs* | *Properties, Inc., Dominion Homes, Inc.* |

/s/ Bruce L. Ingram
Bruce L. Ingram

25